## Groff Estate

*Waters, Fleer, Cooper & Gallagher*, for accountant, guardian.

TAXIS, P. J., December 15, 1965.—The account shows a balance of principal for distribution of $884,276.39, composed of common stocks, $300,243.91; preferred stocks, $20,569.59; municipal bonds, $482,494;

government bonds, $50,212.50; mortgage, $4,000; savings bank account, $7,675.60, and tangible personal property, $21,645.46, as shown on pages 2 to 5, out of which there is due income $2,564.67.

A balance of income for distribution is shown of $30,393.76, including the $2,564.67 due from income and $378.26 accrued income advanced on bonds purchased.

The guardianship continues. The filing of an interim account was authorized by decree entered August 27, 1965, on petition under section 601 of the Incompetents' Estates Act of February 28, 1956, P. L. (1955) 1154, as amended. Therein, authorization to file an account was requested because of the large number of transactions that had occurred since accountant was appointed guardian on July 25, 1958; also so that a question which requires the fund to be before the court could be adjudicated.

The balances of principal recited above are the inventory values as of July 25, 1958, with respect to property owned by the ward when her guardian was appointed, and which still composed part of the balance of principal on June 30, 1965, the date to which the account was stated. Investments made by the guardian are included at their cost. In a separate column on pages 2 to 5 of the account, the June 30, 1965 market value for each item is shown. The total thereof is $2,075,433.57. Subsequent revaluation as of September 30, 1965, reflects further appreciation, with a total market value of $2,178,183.10 for the investments only.

The question submitted for adjudication is whether the court lawfully can, and if so under the circumstances should, authorize the guardian to make substantial inter vivos gifts of her surplus property to those who would take that property on her death under her will, in order to save death taxes. In other words,

to do for an incompetent by way of "estate planning" what a competent person of large means could do for himself.

The facts and circumstances are found to be as follows:

The incompetent is a widow, nearly 85 years of age. Her late husband, Charles G. Groff, died in 1940. They had one child, a son, Walter C. Groff, who is living and is 62 years of age. He and his wife, Winifred W. Groff, also living, have one child, Dorothy Joyce Groff Whitmore, aged 34, wife of Harold B. Whitmore, Jr. The Whitmores have two children: Christopher Alan, born May 13, 1962, and Michael Hildreth Groff, born January 15, 1964. The written approval of the ward's granddaughter was submitted and is attached.

Under the will of Charles G. Groff, he gave his entire estate in trust for his wife for life, remainder on her death to their son, Walter C. Groff, if living, and if not to his daughter, Dorothy Joyce (now Whitmore). This court has taken jurisdiction of that testamentary trust (file no. 60001). As of September 30, 1965, the market value of the principal of that trust was almost $400,000. The net annual income therefrom is approximately $8,000.

The guardian has possession of the original of his ward's will, executed October 6, 1947. This was exhibited to the court at the time of the hearing on July 25, 1958, pursuant to which the ward was adjudicated incompetent and the guardian of her estate was appointed. A copy thereof was submitted at the audit of this account.

In her will, executed more than 10 years prior to her adjudication as incompetent, she disposes of her estate thus: All tangible personal property and one-half the residue is given to her son, if living, and if not, to her granddaughter. Out of the other one-half, the residue, $15,000, is to be set aside to pay an annu-

ity of $100 per month to her brother (now deceased), then to his widow (who is living); any balance remaining at her death to go to their children, of whom there are several living. Then, also out of the second half, the residue, $20,000 is given absolutely to her granddaughter; $15,000 to a nephew; and the balance to her son, if living, and if not, to her granddaughter. Thus, if the incompetent's son survives his mother, he will receive all but $50,000 of his mother's estate; if he does not, his daughter will receive all but $30,000 of it.

Blanche B. Groff was admitted as a patient at the Institute of the Pennsylvania Hospital, Philadelphia, Pa., on June 26, 1958, to which she was committed under the Mental Health Act of 1951, upon her adjudication by this court as incompetent. She has remained there continuously from her original admission to the present. The guardian has periodically sought the opinions of eminently qualified medical experts as to the necessity for his ward's continuing hospitalization and for continuing the guardianship, namely: Dr. J. Martin Myers, medical director of the institute, and Dr. Richard A. Brunner, psychiatrist. The guardian engaged Dr. Brunner as his ward's personal psychiatrist, to attend her regularly, for the sake of having the independent opinion of a physician not connected with the Pennsylvania Hospital.

Doctors Myers and Brunner were again requested to give their opinions in connection with this proceeding. Their written statements, dated November 3, 1965, and October 10, 1965, respectively, were submitted at the audit of the account. Both agree that continued hospitalization is necessary for the ward and that she remains incompetent to manage her personal and business affairs. Further, that ". . . there appears to be little likelihood for improvement in her mental status". (Dr. Myers); and "It is quite improbable

that she will change in her present status of being a problem for symptomatic and custodial management": Dr. Brunner.

The gross annual income received by accountant from his ward's own estate, together with the net income received from the estate of Charles G. Groff, deceased, during the five preceding calendar years has been: 1960, $54,531.30; 1961, $55,534.07; 1962, $61,-586.03; 1963, $64,707.06; 1964, $69,878.31; and the estimated amount for 1965 is $70,000.

It is evident from the account that, as the guardian submits, he has from the beginning spared no expense to provide for his ward's mental and physical health everything, by way of medical attention, that is obtainable. She occupies the best available private accommodations at the Institute of the Pennsylvania Hospital. In addition to the staff physicians, she is attended regularly by Dr. Brunner, already mentioned, and by Dr. J. Roderick Kitchell, specialist in cardiology and internal medicine, both under annual retainers; she likewise is examined regularly by an opthalmologist and a dentist. A full-time, private registered nurse has been engaged for years with no other duties than to wait on the incompetent. Aside from expenditures relating to the ward's health, the guardian has purchased for her such things as personal television and radio sets and whatever other items of tangible personal property that would or might contribute to her comfort and enjoyment in any way.

The court is satisfied that the guardian has spent for his ward as many dollars of her income as there could be found ways to spend it, in the exercise of the utmost effort that could be made to provide for her everything that money can buy for a person in her unfortunate condition of mental health. The degree of care the incompetent has received is reflected by her physical health, as to which Dr. Brunner states:

"Her general physical condition is remarkably good for a woman of her advanced years. Indeed, her vigor and activity would be more in keeping with a woman at least a decade her junior. The diabetes that she has is under reasonable control thanks primarily to a rigid nursing supervision which is necessary to control her intake of acceptable food stuff and also for the administration of insulin necessary for control of her diabetes".

Nevertheless, and nothwithstanding this program of unstinted expenditures, surplus income almost immediately began to accumulate. Over a period of years preceding her adjudication as incompetent, and despite a most unproductive investment policy, which the guardian corrected, she enjoyed a surplus of income over and above her personal requirements. During those years, she established a pattern of annual gifts to her only son, his wife and their daughter, the incompetent's only grandchild; likewise, to the widow of her brother and to three charities: the United Fund, the Salvation Army and the American Red Cross.

After the guardian was appointed and took measures to increase the productivity of the estate, it became apparent that there would be sufficient surplus income to warrant continuing the provisions the incompetent had thus made theretofore. In a petition to the court under section 644 of the Incompetents' Estates Act of February 28, 1956, P. L. (1955) 1154, the past history of the incompetent's provisions for her relatives and favored charities were carefully documented, and the existence of surplus income was established beyond doubt. Thereupon, a decree was entered December 17, 1958, authorizing the guardian to continue making those annual provisions out of surplus annual income of the ward and aggregating $4,350 per year.

Within three years thereafter, and notwithstanding these annual gifts out of surplus income, a "surplus-

on-a-surplus" of income amounting to over $26,000 had accumulated. Thereupon and again, under section 644 of the Incompetents' Estates Act of 1955, a further petition was filed requesting increases in the annual allowances authorized by the decree of December 17, 1958, to an aggregate of $17,400. The incompetent's only son and his daughter, incompetent's only grandchild, joined in, stating that neither had any desire to aggrandize the principal of the incompetent's estate, of which one or the other would be, virtually, the sole beneficiary on her death. The requested increases were authorized by decree of this court entered December 1, 1961.

After four more years' experience, history has repeated itself. Despite having expended as much of the incompetent's income as ways and means could be found to spend for medical purposes and for all other purposes, however remotely connected with her benefit and comfort, and despite the substantial increases in the provisions for her relatives and charities, surplus income has continued to pile up. As of October 30, 1965, it exceeded $35,000.

Figures submitted, in connection with this request and substantiated by the account before us, show that the maximum annual requirements of every kind, medical and personal, for the ward in any prior year have aggregated $27,400. In that time, taxes and administration expenses have consumed a substantial part of gross income. When the guardian was appointed, the incompetent's investments were "top-heavy" with common stocks, plus large amounts of uninvested cash in bank in checking accounts earning nothing. In achieving a better balanced portfolio of investments, the guardian was confronted with substantial capital gains on the sale of his ward's common stock holdings (in some cases, for lack of records of her acquisition costs, ascertainable only after protracted efforts on the part

of his counsel; in other cases, unascertainable after all efforts were exhausted).

Nevertheless, accountant, by continually working toward an improvement of the estate as to diversification of investments and also from the income tax aspect, has materially increased the after-tax income of the estate; that is, what has come to be termed in the parlance of estate-planning lawyers as "spendable income". After deducting from the estate's current "spendable income", the amount devoted to the ward, plus an additional allowance of $8,000 per year just in case a second private nurse might be required to provide her with 24-hour private nursing services, and after likewise deducting administration expenses and taxes, there would remain an annual surplus of income calculated at $27,500.

Under the above-mentioned decree of December 1, 1961, $17,400 of that surplus income would be distributed to the persons and charities previously described. While these gifts to the charities would be exempt from gift tax, those to the individuals would be subject to it, as to amounts in excess of the annual exclusions. There would thus remain an estimated annual "surplus on surplus" of income of over $10,000.

If the incompetent were to die with her estate as now constituted, the Pennsylvania transfer inheritance and estate and Federal estate taxes would aggregate approximately $787,500, with the top bracket taxable at 49 percent. If inter vivos gifts of $700,000 were authorized, as requested, there would, of course, be Federal gift tax payable which would amount to $166,360. Thereby, the gross taxable estate on death would be reduced to $1,238,640, on which the death taxes would come to approximately $376,400. Adding to that, the amount of the gift tax makes the total of gift and death taxes payable $542,760, as against a total of $787,500 in death taxes only, if no inter vivos gifts were made.

Thus, the saving in taxes would be $244,740, or over 30 percent.

These calculations are made on the basis that the incompetent will survive the three-year "contemplation of death" period applicable to Federal estate taxes. If she were to die within that period, the amount of the gifts would be included in her gross taxable estate. Nevertheless, that would remain reduced by the $166,-360 gift tax which had been paid, and which would be fully credited against Federal estate tax payable. The net saving in taxes would still be over $88,000, and there would be an additional tax benefit to the donees as the primary objects of the ward's testamentary bounty. Any securities transferred to them in kind as composing the gifts in whole or in part, would thereafter carry the higher date-of-death-of-donor values for purposes of computing their capital gains taxes on subsequent sales, instead of the lower values at which the donor acquired the securities.

The memorandum submitted by the counsel states and addresses itself to several questions. These appear to cover all considerations involved and will be taken up in order.

First, whether the requested gifts would constitute sensible and sound "estate planning" for a person sui juris under the facts and circumstances of this case.

Ordinarily, of course, the orphans' court has no duty to render advisory opinions, and is not concerned with estate planning for persons still living. But here, by reason of Mrs. Groff's incompetence and of the fact that she is a ward of the court, we are called upon to substitute our judgment for hers. That judgment is: If a person in her situation and sui juris, failed to seek and to heed advice to achieve the tax savings realizable by means of inter vivos gifts, it would be evidence of inability to manage his property.

Second, whether there would be left enough in the

ward's own estate, together with the income from her husband's testamentary trust, to assure her of support, maintenance, benefit, comfort and any other possible requirement.

If gifts of $700,000 were made, and gift tax thereon were paid, there would remain in her own estate some $1,300,000. The trust for her would remain intact, and adding the $400,000 therein would make a total of $1,700,000. Even if that yielded a return of but $2\frac{1}{2}$ percent, the income would be over $42,000 per year.

From the most ultra-conservative viewpoint, it is scarcely conceivable that funds in such amount could become inadequate to provide the ward with every necessity and luxury for the rest of her life, however long she may live. In the remote event that income should become insufficient, the principal of her own estate would be available. To consume some of that principal would not necessarily be a catastrophe, for it would serve to reduce her gross taxable estate at death.

Third, if the first and second points would, as they do, support making the gifts, can and should the court authorize them?

The request to authorize inter vivos gifts is founded upon the equitable doctrine of "substitution of judgment". This doctrine appears to have been originated by Lord Chancellor Eldon, in Ex parte Whitbread, 2 Merivale 99, 35 Eng. Reprint 878 (1816), where payments out of the incompetent's estate were authorized for the benefit of his brothers and sisters. The doctrine rests on the theory that the incompetent being a ward of the court, the court should exercise its discretion and assert its judgment to do that which it is reasonable to believe the incompetent would do himself if he had the capacity to act.

The doctrine has been approved and applied by the Supreme Court of Pennsylvania: Hambleton's Appeal, 102 Pa. 50 (1883), where the court said, at page 53:

"All these matters were thus settled by Neal, when of sound mind, to his own satisfaction and for his own welfare and protection in his old age, and to minister to the comfort and convenience of his family, thus formed, he had employed two servants. Such were William Neal's surroundings when he became the ward of the court. That they were reasonable, and that the cost of them was entirely within the income of his estate, are not matters of dispute. What, then, under the circumstances, was the duty of the court? We answer, simply to maintain and carry forward the affairs of William Neal as they were when his mind failed him; to do that which it might reasonably suppose he would have continued to do had he retained his sanity. This is the rule as expressed in Elwyn's Ap., 17 P. F. S. 367, and in Ex parte Whitbread, 2 Mer. 99, and it is certainly a sound and just one".

Thus the only problem is whether the doctrine should be applied in this case.

At the time of its evolvement by Lord Eldon, and through most of the ensuing 150 years, in the cases where recourse to this doctrine was had, the motives were to make provisions for persons of slender means, not necessarily dependents or even relatives, and charities out of an affluent incompetent's surplus of worldly goods. The pressure of death taxes and the resort to inter vivos gifts as a lawful device to reduce the impact of those taxes is of comparatively recent origin. But two reported cases have been found where tax savings were the basis for seeking court authorization for the guardian of an incompetent to make such a gift: Bullock Estate, 10 D. & C. 2d. 682 (O. C. Delaware County, 1957), where authorization was refused, and In re Irénée du Pont, 194 A. 2d 309 (Delaware Chancery, 1963), where authorization was granted.

Irenee du Pont was a man of great wealth, who at advanced age became disabled mentally to the point

where guardians of his estate were required. When the guardians brought their proceeding in the court of chancery, the estate was valued at $176,000,000 and produced annual income of $5,800,000, of which $800,000 remained after taxes. The death taxes on the estate were estimated at $102,500,000. Gifts of stock of a value of some $36,000,000 to the ward's children and grandchildren were sought to be authorized, thereby increasing their total participation in his property by $23,200,000 if he survived for three years, and by $16,100,000 if he did not.

There was an additional problem in the du Pont case in that the equitable doctrine of substitution of judgment had not theretofore been recognized by the Delaware courts. Hence, it was necessary for counsel and the chancellor to examine exhaustively into the origin and history of this doctrine before concluding that it should be adopted and approved, and before even reaching the point of considering whether it should be applied in that case. As pointed out above, our Supreme Court's approval and application of the doctrine more than 80 years ago renders such inquiry unnecessary in the instant case.

In du Pont, it was established that the prospective donees, the ward's children and grandchildren, were the natural objects of his bounty, had received gifts from the ward over a period of years prior to his becoming incompetent, and would take the subject matter of the proposed gift under his will if no gift were authorized. In those respects, if not in the sizes of the sums involved, this situation is entirely parallel. The incompetent here has been shown to have had a long-established policy of gifts to her son, his wife and her granddaughter. The gifts here requested would not in any degree be in conflict with the disposition of the ward's property, as declared by her will, executed long before adjudication as incompetent. It seems no less reason-

able to determine that Mrs. Groff, if sui juris and apprised of the tax savings to be accomplished by inter vivos gifts, would have made them than to reach that conclusion for Mr. du Pont.

Bullock Estate actually preceded the du Pont decision by several years. The only indication from the opinion as to the basis on which it was submitted to that court is that the gifts requested would "materially reduce" inheritance and estate taxes at the ward's death. The gross estate there was $46,318; annual gross income was $3,440, of which $2,300 was used for administration expenses and support of the incompetent's wife. As a veteran in a government hospital, the incompetent's own maintenance involved no cost. With an estate less than the Federal estate tax exemption, any tax saving on death would be negligible.

From the absence of any reference to the doctrine of substitution of judgment in the opinion, it is evident that this was not called to the attention of the court at all. Even had this doctrine been pointed to and recognized as supplying a legal foundation in a proper case, the court might well have reached the same conclusion, declining to apply the doctrine because of the weakness of the facts and surrounding circumstances.

Bullock Estate was cited to and considered by the Delaware chancellor in the du Pont case, but was rejected in favor of considering, then adopting and applying the doctrine of substitution of judgment.

Section 644 of the Incompetents' Estates Act of 1955 authorizes a guardian of the estate of an incompetent, "in the exercise of reasonable discretion", to expend all income for his care and maintenance without court approval. It goes on to provide that the court may authorize or direct "the payment or application of . . . all of the income or principal of the estate . . . for the care, maintenance or education of the incompetent, his

spouse, children or those for whom he was making such provision before his incompetency. . . ."

While this section may be said to "circumscribe" the power of a guardian, nothing is expressly stated there or elsewhere in the act to indicate any legislative intent to circumscribe the power of the *court*.

The Orphans' Court Act of August 10, 1951, P. L. 1163, sec. 301 (4.1), as amended, gave this court exclusive jurisdiction of the estates of all incompetents arising in this county after its effective date, as this estate arose. And in section 304, the legislature conferred on the orphans' court "all legal and equitable powers required for or incidental to the exercise of its jurisdiction".

In the Incompetents' Estates Act of 1955, there is, for example, nowhere any express provision empowering the orphans' court to authorize a guardian to elect to take against the will of the incompetent's spouse. Nor were there any such express statutory provisions in any applicable statutes prior to the Act of 1955. Yet a considerable body of case law on that subject was developed over a period of many years, including subsequent to the effective date of the Act of 1955.

Absent any statutory authority for the *guardian* to make such an election on his own judgment, cases where he undertook to do so were struck down. It was consistently held that this was a question for the judgment of the court, and without seeking and obtaining court approval, the guardian's independent action was a nullity. This was restated in Peden Estate, 409 Pa. 194 (1962). It was not even considered that absence of express statutory authorization could deprive the orphans' court of power to authorize a guardian, in a case where the court exercising its judgment deemed it proper to elect to take against the will of the incompetent's spouse.

The legislative grant in section 304 of the Orphans'

Court Act of 1951, of "all legal and equitable powers required for or incidental to the exercise of its jurisdiction", was not new. The equivalent was theretofore supported by section 9 (n) of the Orphans' Court Act of June 7, 1917. We conclude that this suffices to continue the long-established equitable doctrine of substitution of judgment, and that the doctrine should be applied in the instant case under the facts and circumstances found to prevail here.

Having concluded that gifts of principal should be authorized, it must next be determined in what total amount and how that total should be allocated among the donees. The petition for adjudication (supplement, par. 30) suggests a total of $700,000, to be divided among the four surviving persons and the three charities for whom provisions were made by the ward prior to her incompetence, as follows:

1. Walter C. Groff, son and only child .. $600,000
2. Dorothy Joyce Groff Whitmore, only grandchild ....................... 50,000
3. Winifred W. Groff, wife of son ...... 35,000
4. Clara Hollinger, widow of brother ... 6,000
5. United Fund .................... 3,000
6. Salvation Army ................... 3,000
7. American Red Cross .............. 3,000

Gifts of principal to the first three persons named, the ward's son, granddaughter and daughter-in-law, are approved and awarded in the amounts stated, to be composed of securities at their market values, as shown in the account. To include gifts of principal to the ward's sister-in-law and the three charities at this time would, in the judgment of the court, add unnecessary complications. The net ascertained balance of principal remaining after the gifts awarded herein is awarded back to accountant for the uses and purposes of the ward.

The net ascertained balance of income for distribu-

tion is awarded back to accountant. The decree of December 1, 1961, authorizing annual gifts out of surplus income is hereby amended, as follows:

(1) Gifts in the amounts therein authorized to Walter C. Groff, Dorothy Joyce Groff Whitmore and Winifred W. Groff are revoked.

(2) Out of any future surplus of annual income, after accumulating a reserve of $5,000, accountant is authorized to distribute annually to Clara Hollinger, $600, and to the United Fund, Salvation Army and American Red Cross, $400 each; these gifts to abate pro tanto if the surplus annual income is less than $1,800.

(3) If the surplus annual income in any year shall exceed $1,800. after accumulation of the reserve of $5,000, accountant is authorized to distribute such surplus in proportion among all the surviving persons and the charities, according to the amounts originally authorized by the decree of December 1, 1961. . . .

And now, December 15, 1965, this adjudication is confirmed nisi.